IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BENNIE BLANKENSHIP,

       Petitioner,

   v.

A.P. KANE, Acting Warden and ARNOLD
SCHWARZENEGGER, Governor,

       Respondents.

_____/

No. C 04-5450 CW

ORDER GRANTING
PETITION FOR WRIT
OF HABEAS CORPUS

Plaintiff Bennie Blankenship, an inmate at Soledad
Correctional Training Facility in Soledad, California, filed pro se
this petition for a writ of habeas corpus based on former Governor
Gray Davis' reversal of the decision of the Board of Parole
Hearings (Board)[1] that Plaintiff was suitable for parole.
Respondent A.P. Kane opposes the petition.  Petitioner, now
represented by counsel, has filed a traverse.  Having considered
all of the papers filed by the parties, the Court GRANTS the
petition for a writ of habeas corpus.

BACKGROUND

On February 5, 1983, at approximately 6:00 a.m., Petitioner
shot the victim, Orbie Thomas, in the head with a shotgun.  Resp's.
Ex. 4, 2002 Life Prisoner Evaluation Report at 1.  On the night

_____

[1]The Board of Prison Terms was abolished effective July 1,
2006, and replaced with the Board of Parole Hearings.  Cal. Penal
Code § 5075(a).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

before the crime, Petitioner, his cousin and the victim's sister, Gwen, had gone to a motel where Gwen had sex with Petitioner. Resp's. Ex. 6, Probation Report at 2.  All three were drinking and smoking PCP.  Resp's. Ex. 5, Initial Parole Consideration Hearing, June 13, 1990 at 9, 42.  Gwen was going to have sex with Petitioner's cousin, and Petitioner left to get something to eat. Resp's. Ex. 6 at 5-6.  When Petitioner returned, his cousin was running down the alleyway saying that Gwen was yelling "rape." Resp's. Ex. 6 at 6.  At about 6:00 a.m. on February 5, Petitioner and his cousin drove Gwen home to the victim's house; Gwen got out of the car and ran to the victim's house screaming that she had been raped.  Resp's. Ex. 4 at 1.  Gwen's family, including the victim, exited the house.  Petitioner's parents lived across the street from the victim.  Resp's. Ex. 6 at 6.  The victim approached the vehicle in which Petitioner was still sitting and the two men exchanged words.  Resp's. Ex. 4 at 1.  The victim asked his common-law wife to get his gun, but she did not do so.  Resp's. Ex. 6 at 5.  The victim and his wife entered his residence.  <u>Id.</u> Petitioner and his cousin left the area and went to Petitioner's sister's house where Petitioner obtained a shotgun and returned to the area where his parents and the victim lived.  <u>Id.</u> at 6. Petitioner stated that he armed himself because he was afraid the victim might hurt his parents who lived across the street.  <u>Id.</u>

Shortly thereafter, the victim took his dog for a walk.  <u>Id.</u> The victim's common-law wife observed the victim standing near a vehicle talking with Petitioner, who was seated on the right passenger's seat.  <u>Id.</u>  Shortly thereafter, the victim's common-law

**United States District Court**
For the Northern District of California

wife observed a gun go off and strike the victim in the head.   _Id._
at 5.   The gun was fired by Petitioner.   _Id._   Soon after the
shooting, the driver drove the vehicle away from the crime scene.
_Id._   A butcher knife was found on or near the victim.   _Id._

After his trial and conviction, Petitioner gave the following
statement to the probation officer investigating his case.
Petitioner was sitting in the front seat of his cousin's car when
the victim approached him.   _Id._   Petitioner pointed the shotgun at
the victim and told him to step back.   _Id._   The victim complied,
but approached Petitioner a second and third time.   _Id._   Each time
the victim approached the vehicle, Petitioner asked him to step
back.   _Id._   When the victim approached the vehicle the fourth time,
Petitioner thought the victim was removing a knife or a gun from
his jacket pocket.   _Id._ at 7.   Fearing for his safety, Petitioner,
turned his head and pulled the trigger of the shotgun, hitting the
victim in the head area.   _Id._; Resp's. Ex. 4 at 2.

At approximately 2:15 p.m. the same day, Petitioner
surrendered of his own volition at the Los Angeles Police
Department.   _Id._ at 1.   Petitioner waived trial by jury in favor of
a court trial and on August 10, 1983, he was convicted of second
degree murder.   Resp's. Ex. 1, Indeterminate Sentence Report at 1.
On November 9, 1983, Petitioner was sentenced to fifteen years to
life in prison.   Resp's. Ex. 1, State Judgment at 1.   Petitioner
was given credit for 416 days in custody.   _Id._ at 2.

After approximately twenty years in custody and his eleventh
consecutive parole date denial by the Board, Petitioner filed a
petition for writ of habeas corpus in the Los Angeles Superior

Court.  On April 3, 2003, the superior court issued an order in which it found that the Board said:

> nothing about why [Petitioner] currently presents an unreasonable risk of danger to society if released. . . . the Board chooses to hang its hat on the 'commitment offense and its nature,' something that never can change and could keep an inmate confined forever if it continues to be the dominant factor in justifying continued confinement.  Even though Title 15 C.C.R., section 2402(a) demands that the Board set a release dated [sic] unless the prisoner <u>currently</u> presents an unreasonable risk of danger for the public, there is absolutely nothing in the Board's decision indicating the basis for that belief.

Pet.'s Ex. A, <u>In re Bennie Blankenship</u>, April 3, 2003 Order Re: Writ of Habeas Corpus, No. BH 002016, Superior Court for the County of Los Angeles at 1 (emphasis in original).

The superior court concluded:

> The Court's authority in parole matters is, unfortunately, very limited.  The most it can do is order a new hearing, if warranted. . . . The Board is therefore ordered to conduct a new hearing within 60 days of receipt of this order and follow the dictates of <u>In re Ramirez</u>, 94 Cal. App. 4th 549 in assessing petitioner's suitability for parole.

<u>Id.</u> at 2.

On May 23, 2003, at a rehearing, the Board found Petitioner suitable for parole.  The Board considered the commitment offense, Resp's. Ex. 2, 2003 Parole Hearing Transcript at 10-12, noting that it resulted from significant stress in Petitioner's life due to a heavy substance abuse problem, <u>id.</u> at 84.  The Board found that Petitioner lacked a significant criminal history in that Petitioner has no juvenile record and as an adult, he was convicted of a misdemeanor for throwing an empty bottle at a car for which he was sentenced to twenty-four months probation, and burglarizing a

4

United States District Court
For the Northern District of California

vehicle, for which he was sentenced to two months in county jail.[2]
The Board also found that Petitioner had realistic parole plans
which included family support and a possible job, had maintained
close family ties while in prison, had maintained positive
institutional behavior, showed signs of remorse, accepted
responsibility for the crime and demonstrated a desire to change
towards positive citizenship.  Id.  The Board noted that the most
current psycho-social report, dated April 19, 2003, indicated that
Petitioner represented no more danger to the community than the
average citizen.  Id. at 85.  The Board acknowledged that the
report also indicated that the greatest threat to Petitioner's
remaining violence-free in the community would be any return to
drug or alcohol use, but noted that Petitioner had been a regular
attendee at Alcoholics Anonymous (AA) and Narcotics Anonymous (NA)
meetings and seemed sincere in his commitment to refrain from all
substance use.  Id.  The Board noted that a December 20, 2002
psychological report indicated that Petitioner was competent,
responsible and had the capacity to abide by institutional rules
and had done so during his period of incarceration.  The Board
noted that Petitioner had upgraded educationally in prison by
obtaining his General Education Degree, taking college courses and

---

[2]In its findings section, the Board overlooked the fact that
Petitioner had also been arrested on October 10, 1982 on a charge
of burglary of a home.  Petitioner entered a guilty plea on this
charge and was sentenced to six years in prison to run
consecutively with his sentence for second degree murder.  Resp.'s
Ex. 2 at 84; Resp.'s. Ex. 6 at 7-8; Resp.'s Ex. 6, app. 1, December
12, 1983 Probation Officer's Rept. at 1-3.  However, in its
computation of the matrix for his base term, the Board assessed
thirty-six months for the home burglary.  Resp.'s Ex. 2 at 86.

United States District Court
For the Northern District of California

participating in numerous self-help programs and in therapy treatment. Id. at 83. The Board also stated that Petitioner had upgraded vocationally while in prison by taking machine shop and shoe repair classes and was currently a mechanic in a job assignment with positive to above-average performance reviews. Id. at 83-84. The Board also noted that Petitioner had been free from disciplinary action for over nineteen years. Id. at 84.

The Board compared Petitioner's offense with similar crimes by computing his matrix of base terms and found that his offense warranted a "II-B" category, which has a base term of seventeen to nineteen years. Id. at 86 (citing 15 Cal. Code Regs., title 15, § 2403(c)). The Board chose the aggravated term of nineteen years because, during the commission of the offense, Petitioner had an opportunity to cease, but continued with committing the offense. Id. The aggravated term was chosen also because the manner in which the crime was committed created potential of serious injury to persons other than the victim. Id. The Board assessed an additional thirty-six months for the home burglary conviction and twelve months for the personal use of a firearm in the murder case. Id. at 87. The total number of months assessed was 276, or twenty-three years. Id. The Board awarded Petitioner seventy-two months of time credit yielding a total term of incarceration of 204 months, or seventeen years. Id. Petitioner had already been in prison for twenty years. Id. He has now been in prison for twenty-four years.

On October 20, 2003, former Governor Davis reversed the Board's decision, finding that Petitioner was unsuitable for

parole.  Resp.'s Ex. 3.  In his written review, Governor Davis commended Petitioner for his progress while incarcerated; however, he concluded that Petitioner posed an unreasonable risk to public safety.  Id. at 2.

On December 24, 2003, Petitioner filed in the Los Angeles superior court a petition for writ of habeas corpus challenging the Governor's decision.  Pet.'s Ex. D, In re Bennie Blankenship, BH002567, April 22, 2004.  The court upheld the Governor's decision, finding that even though it disagreed with many of the Governor's findings, his findings as to the nature of the commitment offense were supported by a "modicum" of evidence.  Id. at 2.

Petitioner filed habeas petitions with the California appellate court and the California Supreme Court, which were denied.  Resp's. Exs. 11, 13.  On December 27, 2004, Petitioner filed this federal petition for a writ of habeas corpus. Respondent moved to dismiss arguing that the Court lacked subject matter jurisdiction because Petitioner had no federally protected liberty interest in parole.  In its February 28, 2006 Order Denying Respondent's Motion to Dismiss, the Court held that Petitioner has a federally protected liberty interest in parole.

LEGAL STANDARD

A district court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or the laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21

United States District Court
For the Northern District of California

(1975).   Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams, 529 U.S. at 405-06).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.

United States District Court
For the Northern District of California

Rather, that application must also be unreasonable." Id. at 411.
A federal habeas court may also grant the writ if it concludes that
the state court's adjudication of the claim "resulted in a decision
that was based on an unreasonable determination of the facts in
light of the evidence presented in the State court proceeding."  28
U.S.C. § 2254(d)(2); Rice v. Collins, 126 S. Ct. 969, 975 (2006).

In determining whether the state court's decision is contrary
to, or involved an unreasonable application of, clearly established
federal law, a federal court looks to the decision of the highest
state court to address the merits of a petitioner's claim in a
reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th
Cir. 2000).  Therefore, the Court addresses the state superior
court's decision affirming the Governor.

DISCUSSION

Petitioner argues that the state court decision affirming the
Governor involved an unreasonable application of federal law
because no evidence supports the Governor's finding of parole
unsuitability and therefore it violated Petitioner's constitutional
right to due process.  Petitioner also argues that the Governor's
decision reflects the executive's systematic bias against grants of
parole and that it violates the ex post facto clauses of the state
and federal constitutions.  Because the Court grants the petition
based on Petitioner's first argument, the Court does not reach the
latter two grounds.

Under California law, the Governor considers the same factors
as the Board in determining whether to affirm or reverse the
Board's decision.  Johnson v. Finn, 2006 WL 195159, *6 (E.D. Cal.)

9

**United States District Court**
For the Northern District of California

(citing Cal. Const., art V, § 8(b); <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 660 (2002).

Respondent argues that, under AEDPA, the "some evidence" standard of <u>Superintendent v. Hill</u>, 472 U.S. 445 (1985), does not apply to parole suitability hearings because the United States Supreme Court has not applied it in that context.  In <u>Sass v. California Bd. of Prison Terms</u>, 461 F.3d 1123, 1129 (9th Cir. 2006), the Ninth Circuit addressed this very argument.  The <u>Sass</u> court explained that, because California has created a liberty interest in parole, the requirements of due process must be satisfied at parole hearings.  <u>Id.</u> at 1128-29.  The court continued:

> <u>Hill</u>'s some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'  <u>Hill</u> held that although the standard might be insufficient in other circumstances, '[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.'  To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest – that in parole – without support or in an otherwise arbitrary manner. We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context.

<u>Id.</u> at 1129 (internal citations omitted).

Therefore, a parole board's decision must be supported by "some evidence" to satisfy the requirements of due process.  <u>Sass</u> at 1128.

The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced.  <u>Hill</u>, 472 U.S. at 455.  An examination of the

entire record is not required nor is an independent weighing of the evidence.  Id.  The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board.  Id.

In assessing whether or not there is "some evidence" supporting the Board's denial of parole, the Court must consider the regulations which guide the Board in making its parole suitability determinations and which guide the Governor in his review of the Board's decisions.  California Code of Regulations, title 15, section 2402(a) states, "The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  The regulations direct the Board to consider "all relevant, reliable information available."  Cal. Code of Regs., tit. 15, § 2402(b).  Further, they list sets of circumstances tending to indicate whether or not an inmate is suitable for parole.  Id. § 2402(c)-(d).

The circumstances tending to show an inmate's unsuitability are (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) a previous record of violence, particularly if assaultive behavior occurred at an early age; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as a "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct. Id. § 2402(c).  The circumstances tending to show suitability are

United States District Court
For the Northern District of California

(1) no juvenile record of violent crimes; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law.  Id. § 2402(d).

However, these circumstances are meant to serve as "general guidelines," giving the Board latitude in the weighing of the importance of the combination of factors present in each particular case.  Id. § 2404(c).

Under § 2402(c)(1) of title 15 of the California Code of Regulations, the factors to be considered when determining whether the commitment offense was carried out in an especially heinous, atrocious or cruel manner are (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

The regulations contain a matrix of suggested base terms for several categories of crimes.  See id. § 2403.  For example, for second degree murders, the matrix of base terms ranges from a low of fifteen, sixteen, or seventeen years to a high of nineteen,

United States District Court
For the Northern District of California

twenty, or twenty-one years, depending on the facts of the crime.

The California Supreme Court has determined that the facts of the crime alone can support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  In re Dannenberg, 34 Cal. 4th 1061, 1071 (2005); see also In re Rosenkrantz, 29 Cal. 4th at 682-83, cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

The Governor found that Petitioner was not suitable for parole and would pose an unreasonable danger to society if released, based on the following: (1) the gravity of the offense; (2) Petitioner's extensive substance abuse problem; (3) Petitioner's unstable social history; and (4) Petitioner's lack of any confirmed employment.

The state habeas court affirmed the Governor's decision, but rejected the third and fourth reasons upon which the Governor relied.  In rejecting the Governor's finding that Petitioner has an unstable social history, the court explained that the evidence, in the form of letters of support from Petitioner's family, showed the

reverse, that he has stable relationships with others despite his former drug use and criminal conduct. Thus, the court implicitly disagreed with the Governor that Petitioner's past substance abuse could provide the evidentiary support necessary for a finding of unsuitability for parole.

The state court also rejected the Governor's finding that Petitioner had no employment plan because the evidence showed that Petitioner had an offer of employment at Fred Jefferson Memorial Homes. In upholding the Governor's decision, the court merely stated that "the Governor's findings as to the nature of the commitment offense are supported by, at least, a 'modicum' of evidence. Accordingly, the court finds that there is 'some evidence' to support the Governor's finding that Petitioner is unsuitable for parole."

Because the state court did not discuss the evidence supporting the Governor's finding, this Court addresses the Governor's reasons directly.

Regarding the gravity of the offense, the Governor stated:

> Foremost, I believe the Board gave insufficient consideration to the gravity of Mr. Blankenship's crime. High on PCP, he argued with Mr. Thomas. He left the scene and could have stayed away, ending the matter. Yet, merely ten minutes later, he returned armed with a loaded shotgun. Without provocation, he shot Mr. Thomas in the head and drove off. Based on the gravity of the offense alone, I believe that consideration of public safety requires a more lengthy period of incarceration.

> The circumstances surrounding this murder indicate a level of premeditation such that Mr. Blankenship could have been convicted of first degree murder. Thus, the egregious facts of this crime are clearly more than the minimum necessary for a conviction of second degree murder. Based on the exceptional indifference to human

14

life Mr. Blankenship demonstrated, I believe that public
safety requires a longer period of incarceration.

Resp.'s Ex. 3 at 2.

The Governor cited the fact that Petitioner left the
scene of the altercation with the victim and then returned
with a gun as a basis for his conclusion that the offense was
premeditated.  However, the evidence shows that, even though
Petitioner left the scene and then returned with a gun,
Petitioner was sitting in a car parked on the street and the
victim came over to the car.  Pet's. Ex. B, May 23, 2003
Parole Hearing Transcript at 11.  Based on these facts, the
trial judge found that Petitioner's offense was murder in the
second degree.

In stating that Petitioner's crime was premeditated, the
Governor appeared to be addressing the standard set forth in
In re Rosenkrantz, 29 Cal. 4th at 658, 683, that when the
Board finds parole unsuitable based solely on the facts of
the commitment offense, it must cite some evidence of factors
beyond the minimum elements of that offense.  However, the
Governor's characterization of Petitioner's actions as
premeditated is incorrect because the trial court found that
the offense was murder in the second degree.

Accordingly, the Court finds that the Governor's
determination that the circumstances of the commitment
offense were egregious and beyond what is ordinarily required
for a conviction of second degree murder is not supported by
"some evidence."  Therefore, the state court's decision

15

1  affirming the Governor on this ground is an unreasonable

2  application of federal law.

3      The Governor also asserted that Petitioner's version of

4  the offense had changed over time as evidence that he was not

5  remorseful.  The Governor stated:

> Mr. Blankenship admits shooting Mr. Thomas.
> However, he has consistently asserted that he acted
> in self-defense.  Also, since his incarceration,
> Mr. Blankenship's version of the crime has changed.
> Initially, he implied that he believed Mr. Thomas
> was armed.  In 1993, he began to claim that Mr.
> Thomas actually threatened him with a 13-inch
> butcher knife.  However, four different witnesses,
> including his own cousin and driver of the getaway
> car, all maintain that he shot Mr. Thomas without
> provocation. Thus, I believe his present and past
> attitude towards the murder are unacceptable and
> undermine his expression of responsibility.

13  Resp.'s Ex. 3 at 2.

14      The only inconsistency the Court can locate is that

15  Petitioner first denied that he had been abusing drugs on the

16  night of the offense.  <u>See</u> Resp.'s Ex. 6, 1983 Probation

17  Report ("The Defendant denies both past and present use of

18  all narcotics, dangerous and non-prescription drugs.").  The

19  2002 Life Prisoner Evaluation Report states, "The prisoner's

20  version written on June, 1990 and July, 1992 is inaccurate

21  according to Inmate Blankenship . . ." Resp's. Ex. 4.  This

22  report does not indicate how Petitioner's past versions were

23  inaccurate, but it could be in regard to his original denial

24  of abuse of drugs.  Otherwise, Petitioner's version of the

25  offense through the years has been substantially consistent.

26  The Governor emphasizes that, originally, Petitioner said he

27  thought the victim was armed, but that in 1993, he began to

28

16

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

claim that the victim threatened him with a butcher knife.
However, Petitioner has consistently said that he felt
threatened by the victim's behavior and either that he
thought the victim was reaching for a weapon or thought he
had a weapon.  For instance, the April 19, 2003 Mental Health
Evaluation for Board of Prison Terms Parole Consideration
Hearing (2003 Mental Health Evaluation) reports that
Petitioner described the events leading up to the offense as
follows:

> [Petitioner] and his cousin left the area after the
> initial confrontation with Gwen's brother.  He
> reported that he went to his sister's house and
> became concerned about the safety of his family
> across the street from where Gwen and her brother
> lived.  He stated this especially of concern [sic]
> since the brother called out to his wife to bring
> him a gun.  [Petitioner] took a shotgun from his
> sister's home and returned with his cousin to the
> area.  When they drove up, [Petitioner] reported
> that Gwen's brother came up to the car with a
> Doberman and his hand in his pocket.  It eventually
> became clear that the victim had a weapon.  He was
> told by [Petitioner] to get away from the car which
> he did.  However, he approached again and after
> several retreats and approaches, [Petitioner]
> stated, 'after five times coming out of his pocket
> I turned my head and pulled the trigger.  I wasn't
> thinking clearly.  Wired up on drugs and alcohol .
> . . being up all night.  He had sent for a gun.  I
> made some bad judgments.'

Resp.'s Ex. 7 at 5.  Petitioner reported similar versions of
the events leading up to the offense as evidenced in:  (1)
the December 20, 2002 Psychological Evaluation for the Board
of Prison Terms Parole Consideration Hearing, which states,
"Inmate Blankenship described the circumstances surrounding
his commitment offense.  It was the same account that he has
given previously over the years.", Pet.'s Ex. C at 4-5; (2)

United States District Court
For the Northern District of California

the 2002 Life Prisoner Evaluation Report, Resp.'s Ex. 4 at 1-2; and (3) the August 30, 1983 Probation Officer's Report, Resp.'s Ex. 6 at 5-7.  The Governor did not mention that the 1983 Probation Report indicated that a butcher knife was found on or near the victim's body.  Resp.'s Ex. 6 at 5.

Furthermore, although the Governor concluded that Petitioner did not express adequate remorse for his offense, in his psychological evaluations, Petitioner did express regret that he had killed the victim.  See e.g., Resp.'s Ex. 7 at 5 (Petitioner admits his culpability, admits his judgment was flawed, and expresses sincere and appropriate remorse for his act); Pet.'s Ex. C at 4 (Petitioner admits he made the mistakes of drug use, using drugs to have sex, arming himself and coming back to the scene of the altercation); Petitioner's Ex. D at 6 (Petitioner admits his culpability for the crime; he admits he used poor judgment and that his actions led to the demise of the victim).

The state court affirmed the Governor's decision only in regard to the gravity of the offense and did not explicitly address the Governor's second reason for reversing the Board, that is, Petitioner's extensive substance abuse problem.  The Court will independently review the record regarding Petitioner's substance abuse problem.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006) (when there is no state court decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of

18

clearly established federal law).

The Governor indicated that he considered Petitioner's past substance abuse a reason to reverse the Board's decision, on the grounds that Petitioner had been abusing PCP since the age of sixteen, using it twice a week for eight to nine years and that Petitioner is an alcoholic.  The Governor stated his belief that Petitioner must continue his participation in substance abuse counseling before he will be suitable for parole.

However, Petitioner has participated in AA and NA for many years and has expressed the self-knowledge that substance abuse caused him to act with poor judgment and was a major factor in his commitment offense.  Petitioner's latest psychological evaluation indicates that Petitioner "certainly seemed sincere in his commitment to refraining from all substance use upon his return to the community," Resp.'s Ex. 7 at 6, and that conditions of parole would require Petitioner to abstain from all illegal drugs and alcohol, random monitoring, and mandatory attendance at AA or other self-help groups.  The record contains no evidence that Petitioner is currently abusing alcohol or drugs.  Therefore, there is no evidence that Petitioner needs more substance abuse counseling before he is suitable for parole.

In sum, there is no evidence to establish unsuitability for parole under California regulations.

Other factors indicate that Petitioner is suitable for parole.  First, the fact that Petitioner's criminal record is

19

minimal and involves no violence supports the conclusion that the offense was situational.  Second, Petitioner's psychological evaluations consistently stated that he would pose a low threat to the public safety if released.  See e.g. Resp.'s Ex. 7 at 6 (Based upon the lack of a violent criminal history and the fact that in all prior assessments, Petitioner was judged to be non-violent, Petitioner "is seen as representing no more danger in the community than the average citizen living in the community."); Pet.'s Ex. C at 5-6 ("If released to the community, [Petitioner's] violence potential is estimated to be no higher than the average citizen in the community."  This is based on the fact that he has no violent criminal history and the continued evaluations of him "as an exemplary inmate who has no sign of antisocial tendencies, and with a low potential for violence.").

Furthermore, since his incarceration, Petitioner has upgraded his education, vocational skills and self-awareness. As detailed by the state habeas court, while in prison, "Petitioner has completed his GED as well as courses in machine shop and shoe repair.  He has been a participant in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) for almost nineteen years.[3]  Petitioner has also completed courses in Anger Management and infectious diseases.  He has received many favorable reviews from staff and the

---

[3]The 2002 Psychological Evaluation indicates that Petitioner attended AA since 1988 and NA since 1991.  Therefore, the state habeas opinion, written in 2004, might have over-stated the number of years Petitioner attended AA and NA meetings.

United States District Court
For the Northern District of California

psychologist reports that he is an ideal candidate for
parole.  Petitioner received only one disciplinary violation
and that was in 1985.  Petitioner has many offers of a place
to live and an employment offer . . . to work as a
maintenance person, as well as many offers of assistance in
finding employment."  Pet.'s Ex. A at 1-2.

Petitioner has accomplished many things that make him
suitable for parole under California Code of Regulations,
title 15, § 2402(d).  Petitioner does not have a record of
violent crime, he has a stable social history, he has shown
remorse, he committed the crime as a result of significant
stress in his life, he has made realistic plans for release
and has marketable skills that can be put to use upon
release, and his institutional activities indicate an
enhanced ability to function within the law upon release.
Thus, there is substantial evidence to support parole
suitability.

As indicated above, the California regulations require
the Board to find some evidence that the prisoner poses a
present danger to society.  A continued reliance over time on
an unchanging factor, such as the commitment offense and past
substance abuse, does not provide evidence of a present
danger to society and thus may rise to the level of a due
process violation.  Reliance on unchanging factors transforms
an offense for which California law–and the sentencing
judge–provided parole eligibility into an offense carrying
life imprisonment without the possibility of parole.

United States District Court
For the Northern District of California

The Ninth Circuit has stated that a federal habeas court may consider the parole board's decision-making over time:

> The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003).

In a more recent case, the Ninth Circuit noted that

> in all cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

Irons v. Carey, 479 F.3d 658, 665 (9th Cir. 2007). Cf. Sass, 461 F.3d at 1129.

Here, Petitioner had served approximately twenty years at the time of the parole hearing in question, and has now served twenty-four. His sentence included a fifteen-year minimum term and the Board found that Petitioner's uniform term was only seventeen years.

1    Accordingly, the Governor's decision to reverse the

2    Board based on Petitioner's offense and past substance abuse

3    is not supported by "some evidence" and the state court's

4    decision affirming the Governor was an unreasonable

5    application of federal law.

6    III. Appropriate Procedure Upon Reversal

7    In In re Capistran, 107 Cal. App. 4th 1299, 1302 (2003),

8    the Governor had reversed the Board's decision granting

9    parole but the state habeas trial court reversed the Governor

10   and instructed the Board to set a parole date.  The habeas

11   appellate court affirmed the lower court's ruling that the

12   Governor's decision was not sufficiently supported by

13   evidence and affirmed the granting of the writ of habeas

14   corpus.  However, the appellate court held that the trial

15   court erred in ordering the petitioner's release.  Instead it

16   ordered the trial court, on remand, to order the Governor to

17   vacate his decision and to proceed to review the Board's

18   decision in accordance with due process of law.  Id.

19   This Court will follow the procedure set out in

20   Capistran.  Therefore, it grants the petition for writ of

21   habeas corpus and remands to the current Governor to vacate

22   the decision of the previous Governor and to review the

23   Board's decision in accordance with due process of law.

24                    CONCLUSION

25   The petition for writ of habeas corpus is granted.  The

26   Board's decision granting parole shall be deemed reinstated

27   as of the date the previous Governor's order is vacated.

28
                          23

Within thirty days thereafter, the Governor, in his
discretion, may issue a new decision or he may allow the
Board's decision to stand.

              April 12, 2007

Dated _____                          _____
                                                       CLAUDIA WILKEN
                                                       United States District Judge

**United States District Court**
For the Northern District of California

24